THE CITY OF NEWARK, A MUNICIPAL CORPORATION, AND MICHAEL P. DUFFY, DIRECTOR OF THE DEPARTMENT OF PUBLIC SAFETY, PROSECUTORS, v. CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY, AND JAMES GUILIANO, RESPONDENTS.

Submitted October 12, 1934—Decided February 16, 1935.

Before Justices Trenchard, Heher and Perskie.

For the prosecutors, *Frank A. Boettner* (*Thomas M. Kane*, of counsel).

For the respondents, *Luke A. Kiernan, Jr.*

The opinion of the court was delivered by

Perskie, J. This writ of *certiorari* brings up for review the ruling, apparently treated by all parties as a judgment, at least there is no objection raised on this score, of the civil service commission of the state in which it set aside the dismissal of the respondent Guiliano from the position of patrolman in the uniformed police department of the city of Newark, by the director of the department of public safety of that city; and in which ruling it was ordered that said director reinstate the respondent to his position and pay of patrolman in said police department as of January 16th, 1934, the day of his suspension.

The record discloses that respondent Guiliano had been, prior to January, 1934, a member of the police department of the city of Newark for a period of about sixteen years; had been married for twenty-four years and was the father of three children, twenty-three, twenty-one and seventeen years of age; and for about six and one-half years prior to

his suspension he, also, supported his widowed sister-in-law and her three children.

On July 17th, 1934, three separate charges were preferred against him. Succinctly stated they were, substantially, as follows: (1) That he entered a certain building, more fully hereinafter described, while in uniform and not in the actual performance of police duty, i. *e.,* without just cause, and failed to immediately submit a report to his superior officers of his having done so. (Disciplinary rule 13 of the department.) (2) That without just cause he entered this same building and questioned one Elizabeth D. Carney as to whether she had a venereal disease and asked her other improper questions. (Disciplinary rule 16 of the department.) (3) That he was in possession of information which led him to believe that Elizabeth D. Carney was suffering from a venereal disease and failed to report that information to his superior officers. (Disciplinary rule 32 of the department.)

Guiliano pleaded guilty to the first charge before the director of public safety, and on final hearing, held on February 8th, 1934, was adjudged guilty on all charges and ordered dismissed from the department. Thereupon Guiliano appealed to the civil service commission.

The proofs before the commission disclosed that the building, which the respondent was charged as having entered without just cause, and not while in the performance of police duty, was formerly known as the Star Ball Room, and now known as Tangoland, and is located at the corner of Market and Mulberry streets, Newark, New Jersey. This ball room is a public one, and is commonly described as a ten-cent dance hall. The women who worked there were called hostesses; they were obliged to dance with anyone of the patrons who paid the required charge of ten cents a dance.

The place had apparently caused the police department some trouble, because of the congregation of its patrons; there had been complaints of "unnecessary noises" therein; and "loitering and hanging around the place by bums;" "there had been several fights in the ball room and I [Captain

O'Neill] called it to the attention of the officers on the post for that reason." As a result thereof, Captain O'Neill, in charge of the precinct with which respondent was connected on the night in question, testified that he ordered the patrolmen on post, including respondent, "to keep their eyes open and be on lookout for disturbances;" and that as a result of his instructions he was of the opinion, although Deputy Chief Sebold held a contrary view, that a patrolman patroling that section, as did the respondent herein, would have the right to go into that dance hall and see that everything is going on as it should, "look the place over casually;" and unless he did see or find trouble no written report of his having entered the place was necessary. But, "if, however, he did see or find trouble it was the duty of the patrolman to report to his sergeant who met him later that night."

The proofs further disclose that Elizabeth D. Carney, who is married but separated from her husband, was one of the hostesses in this dance hall. Respondent had seen her on several occasions in a restaurant, around four-thirty o'clock in the morning, with one Capoli, alias Russell. Respondent, some time in August, 1934, arrested this same Russell for loitering; at that time Russell was in the company of a girl who was a runaway from the Clinton Reformatory.

On January 3d, 1934, pursuant to directions of Captain O'Neill, Guiliano entered the dance hall in question. He asked to talk with Mrs. Carney. He took her into a side room and that is what he said to her: "I understand you are a stranger in town, I said, 'do you know the company you are going with?' She said, 'I know him.' I said, 'he is bad company. I got information he has a venereal disease, and I would advise you to stay away from him. The reason I am telling you this is that I have two daughters of my own. I don't know whether you had anything to do with this man, but if you did, you better go see a doctor, and if you haven't got any money, go to the board of health.' Then I walked out. She said, 'It is none of your business. I can go with whomever I please.' I said, 'I am only trying to tell you. I am giving you fatherly advice, because I have two daughters of my own your age.' "

Mrs. Carney told Russell of this occurrence and he, apparently, told her to report it to the director. This she did. The respondent was thereafter asked for a report of the occurrence and he furnished it. It is strongly urged that this very report indicates that the police officer had information of the character that required him to report same to his superiors, namely, that Mrs. Carney was living with Russell and that the latter was supposed to be diseased. Guiliano, did, however, testify, although it was denied, that he did report it to a plain clothesman of the department.

It does appear that this police officer during his service of sixteen years with the department had about twenty-five charges preferred against him and that he was disciplined in about half of them. It also, however, appears that there has been no complaint against him since April 24th, 1931.

The commission ruled, *inter alia,* as follows:

"It may be that the appellant did not use the best judgment in this matter but it is not charged that he intended to violate the rules of the department or meddle with the actions and conduct of the employe of the Star Ball Room concerned or that he was prompted in the action taken by any motive other than what he conceived to be his duty."

"The civil service commission recognizes the importance of correct official conduct on the part of members of the uniformed department in their dealings with citizens, but it is of the opinion that any interpretation of the rules of the police department which will not allow some exercise of judgment and discretion in their performance of duty by a member of the department who has seen long service and when there is no improper motive charged or shown will tend to compel officers to fall back upon the exact wording of the rules in every instance when police action is indicated, for their own protection against disciplinary action. Such a condition is bound to reduce the effectiveness of police service.

"It is the conclusion of the civil service commission that the action of the dismissing authority is not warranted by the circumstances in this case, that it should be set aside and the appellant restored to duty as a patrolman, uniformed police department, city of Newark, * * *."

Prosecutors argue seven of the following eight reasons assigned. (1) Because the decision of the civil service commission was contrary to the facts of the case. (2) Because there was sufficient testimony presented before the civil service commission to support the findings and the decision of the director of the department of public safety of the city of Newark. (3) There was no statutory authority for the decision as given by the civil service commission. (4) There is no legal authority for the decision given by the civil service commission. (5) The civil service commission has no statutory or legal power to modify the decision of the director of the department of public safety. (6) There was no evidence to support the findings and decision of the civil service commission. (7) Because by the decision of the civil service commission in rendering its decision, it is attempting to regulate the internal affairs of the department of public safety of the city of Newark.

Reasons 1, 2 and 6 are argued together. They are directed to the factual phase of the case. We are of the opinion that the finding of the commission is fully supported by the proofs. Reasons 3, 4, 5 and 7 are directed toward the legal phases of the case.

It is settled that the civil service commission had jurisdiction in the premises. It was the duty of the commission, appeal by the police officer having been taken within the time prescribed by law, to make an independent investigation, to hold an independent hearing and determine the merits on the testimony taken before it. *Pamph. L.* 1908, *p.* 250, § 24 (*Comp. Stat., p.* 3804), as amended by *Pamph. L.* 1917, *ch.* 236, *p.* 797; *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 2585; *County of Essex* v. *Civil Service Commission,* 98 *N. J. L.* 671. And a decision rendered by the civil service commission is not an attempt to regulate the internal affairs of the department of public safety of the city of Newark. The Municipalities act, the Walsh act and the Civil Service act of our state, with respect to the matters in issue, are properly recognized and treated as statutes *in pari materia. Newark* v. *Civil Service Commission,* 112 *Id.* 571, 573, 575.

And, finally, it is argued under reason 5, that the power of the civil service commission is limited, among other things, as follows:

"If on such hearing the civil service commission shall disapprove of such order of removal, discharge, fine or reduction, the same shall be and remain of no effect."

And that since Guiliano pleaded guilty to the first charge that the commission was without authority to disturb the conviction on that count; that the result reached by the commission of reinstating an officer after he had pleaded guilty —is contrary to orderly procedure and makes the director of public safety unable to carry out the responsibility of his office, and perform the duty that he owes to the public of protecting the public from imposition and enforcing proper and strict discipline in the department. *Crane* v. *Jersey City,* 90 *N. J. L.* 109, 111.

For Guiliano it is argued that the charges heard before the director of public safety were also heard, as an entirety, by the civil service commission and it clearly appears from the testimony that the hearing before the commission was based upon all three charges narrowed down to two specific charges as set down by Commissioner Joyce, to wit: "This is a hearing on the appeal of James Guiliano from his dismissal as patrolman, uniformed police department, Newark, effective February 8th, 1934, on the following charges: (1) Entering any building while in uniform, except in the actual performance of police duty. (2) Neglect of duty."

It seems to us that prosecutor's argument, on this point, appears to be directed or addressed to the policy or the wisdom of the clear provisions of the Civil Service act, rather than to the powers therein conferred upon the commission. Obviously, with such an argument we are not presently concerned. For its validity, as well as its operation in conjunction with other pertinent municipal acts, as herein pointed out, is firmly established. And, besides, we are of the opinion that the contemplated intent of the legislature is clearly found in the act. It expressly provides, *inter alia,* that those, as Guiliano herein, who are entitled to the ·protection and

benefit of the Civil Service act, should, upon proper submission to its jurisdiction, to review, *a removal, discharge, fine or reduction,* receive an independent investigation. The commission, as already pointed out, is obliged to hold an independent hearing and determine the merits on the testimony taken before it. *County of Essex* v. *Civil Service Commission, supra.* It conducts, therefore, a trial *de novo.* It should here be marked that the record before us fails to disclose any plea by the officer, before the commission, on any of the three charges. The case was heard by the commission on the merits.

Moreover, the power of the civil service commission, in cases of this character, appears to be all inclusive. Its power clearly extends, not only to declare a *removal* or *dismissal* a nullity, but, by the express terms of the act, likewise authorizes it to declare a *fine or reduction* as a nullity.

We concur in the result reached by the civil service commission.

The writ is dismissed, with costs.