714 A.2d 945

JOHN A. FERRARO AND DOROTHY FERRARO, PLAINTIFFS–APPELLANTS/ CROSS–RESPONDENTS, v. CITY OF LONG BRANCH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, ADAM SCHNEIDER, MAYOR OF THE CITY OF LONG BRANCH, ANTHONY CRITELLI, DIRECTOR OF PUBLIC WORKS OF THE CITY OF LONG BRANCH, MICHAEL PELUGHI, MICHAEL DE STEFANO, JOHN PALLONE, STEVEN SCHWARTZ, AND ROBERT LEHMANN, DEFENDANTS–RESPONDENTS/ CROSS–APPELLANTS.

JOHN A. FERRARO, PLAINTIFF–APPELLANT, v. ADAM SCHNEIDER, INDIVIDUALLY, AND AS MAYOR OF THE CITY OF LONG BRANCH, AND THE CITY OF LONG BRANCH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 24, 1998—Decided July 23, 1998.

270

Before Judges STERN, KLEINER and KIMMELMAN.

*R.S. Gasiorowski,* argued the cause for appellants/cross-respondents (*Mr. Gasiorowski,* of counsel; *Christie Gasiorowski* and *Robert McLeod,* on the briefs).

*Jacqueline A. DeGregorio,* argued the cause for respondents/cross-appellants (*Weiner Lesniak,* attorneys; *Alan J. Baratz* and *Ms. DeGregorio,* of counsel; *Ms. DeGregorio,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

Following defendants' removal of plaintiffs' complaint to the United States District Court, dismissal of the federal action and affirmance of the dismissal by the Third Circuit, the Law Division, on remand of the State claims from the federal court, entered a series of orders granting defendants' motions for summary judgment and dismissing defendants' counterclaim. Plaintiffs appeal the dismissal of their 42 *U.S.C.A.* § 1983 federal claim and some of their state law claims. Defendants cross appeal from the denial of their application for counsel fees.

I.

A.

On December 23, 1992, John A. Ferraro ("plaintiff") and his wife filed a five-count complaint in the Law Division against the City of Long Branch, its mayor, Adam Schneider, and various other town officials. Count one was subtitled "Civil Rights

Claim—42 U.S.C., Section 1983," count two "Tortious Interference with pursuit of lawful employment," count three "Violation of N.J.A.C. 4A:3–3.4," and count four "Violation of N.J.A.C. 4A:2–5.1." These allegations resulted from plaintiff's municipal work assignments outside the scope of his civil service job description in alleged retaliation for his political conduct. Plaintiff's wife asserted a *per quod* claim in the fifth count. Because of the federal claim, defendants removed the case to the United States District Court.

On August 23, 1993, the District Court dismissed the federal claim and the Third Circuit affirmed on May 10, 1994. *Ferraro v. City of Long Branch*, 23 *F*.3d 803 (3d Cir.1994).

An amended complaint was filed on August 15, 1994 after the remand to the Law Division. However, plaintiffs were granted leave to file a second amended complaint in order to incorporate references to federal law into count four which had alleged unlawful retaliation for plaintiff's protected political activities. On July 21, 1995, plaintiffs were granted leave to further amend count four to reflect a § 1983 claim grounded in violations of the First Amendment. However, all counts of the complaint were ultimately dismissed against all defendants. Also dismissed was a consolidated action [1] by plaintiff against Schneider asserting various state and federal claims, including a defamation count based on the release "[o]n or about August 24, 1993," of a report prepared in defense of plaintiff's workers' compensation petition, as well as defendants' counterclaim for unearned benefits paid to plaintiff. Defendants' motion for counsel fees was also denied.

Plaintiffs appeal, and defendants cross appeal from the denial of counsel fees.[2]

---

[1] We are told the original complaint in the consolidated case was filed in May 1994, although it is not in the appendix. It bears a 1994 term docket number.

[2] In their brief on appeal, plaintiffs indicate that they are not appealing the dismissal of counts two and five of their complaint which alleged, respectively, "tortious interference with pursuit of employment" and the *per quod* claim.

## B.

For purposes of our review of the dismissals, we must accept the facts as alleged by plaintiff.

In 1979, plaintiff became the Long Branch Superintendent of Parks and Public Property, a classified position. In 1982, Long Branch's then-Mayor appointed plaintiff Director of the Department of Public Works, a non-classified position he held for eight years. Plaintiff apparently took a leave of absence from his civil service position during his tenure as Director of Public Works until July 1, 1990.

In 1989, defendant Schneider was elected to the City Council. During his tenure as a Council member, Schneider publicly criticized Ferraro's performance as Director of Public Works. In 1990, Schneider became Mayor. Plaintiff had actively supported Schneider's opponent and actively campaigned on the opponent's behalf. During the campaign, plaintiff was told that Schneider would "get rid of" him.

In July 1990, after Schneider took office, plaintiff, who returned to serve in his classified position, was informed that he was no longer permitted to take his city car home. Shortly thereafter, the new Acting City Administrator directed that everyone in the Department of Public Works "except John Ferraro" could receive "overtime." The Administrator also directed the Acting Director of Public Works to see to it that plaintiff "works."

Sometime after July 9, 1990, when defendant Anthony Critelli became Director of Public Works, plaintiff's work "crew" was reduced, and he was "left ... with one or two men to maintain the parks." According to plaintiff, the duties of the Superintendent "are almost entirely administrative and supervisory in nature." However, because he no longer had a sufficient amount of workers to assist him, plaintiff, who was responsible for the maintenance of 400 to 500 acres, was forced to engage in such "manual labor" as cutting grass and picking up litter. Because of the stress he was

experiencing, plaintiff became physically ill and took extensive sick leave and vacation time in the last half of 1990.

When Ferraro returned to work, he was again directed to perform physical labor which included shoveling sand and picking up debris. He was also forced, at Critelli's direction, to take orders from individuals with "lesser positions" who would have otherwise been his subordinates.

Early in the morning of December 28, 1990, plaintiff was directed to perform snow removal around City Hall following a heavy snow storm. Although the city owned a snow blower, plaintiff and his co-worker were instructed to shovel the snow by hand. While working on the steps of City Hall, plaintiff collapsed and fell to the ground. Rescue workers resuscitated plaintiff and transported him to Monmouth Medical Center. In their subsequent report, the emergency workers noted that, upon their arrival, plaintiff was "unresponsive" and had no pulse.

The incident was the subject of an article which appeared the next day in the *Asbury Park Press*. Plaintiff was described as having "suffered a massive heart attack" in which "[h]is heart had stopped, and he ceased breathing," but that after "cardiopulmonary resuscitation" was performed and "an artificial airway [was inserted] into his throat," "Ferraro's heart and lungs began working again."

Plaintiff never returned to work, although we are told that he did not officially retire until July 1995. A medical report, prepared for the City on or about March 5, 1991, concluded that it was "clear" that plaintiff's "cardiac arrest was precipitated and as such is related to the episode of shoveling snow." Plaintiff was advised by the City Health Care Administrator that his case was "compensable" and that he was entitled to all medical and temporary disability benefits "until ... medically proven to return to work."

Following plaintiff's collapse, plaintiff and his wife had several conversations with Benedict John Forest, a reporter with the

*Atlanticville,* a weekly publication based in Long Branch, regarding plaintiff's medical problems and the treatment he allegedly had been receiving from defendants. Plaintiff told Forest he was "suffering from a severe health problem" and that "his heart attack was brought on by harrassment [sic] during his employment for the City of Long Branch." According to Forest, plaintiff "indicated that Mayor Adam Schneider and Congressman Frank Pallone had a vendetta against him and [ ] were out to get him." Independently, the following article, authored by Wayne Parry, appeared in the *Asbury Park Press* on April 3, 1991:

> The city's former public works director, who suffered a massive heart attack while shoveling snow from City Hall steps in December, is seeking $5 million from the city, alleging he repeatedly was ordered to perform manual labor that was not part of his job.
>
> John A. Ferraro, 50, of Poole Avenue, states that Mayor Adam Schneider, Public Works Director Anthony Critelli Jr. and other city employees caused his injury, alleging he was ordered to shovel the snow and perform other tasks to "humiliate" him.
>
> Ferraro's lawyer, Ronald S. Gasiorowski of Middletown Township, filed a notice of claim last Thursday with the city clerk's office. The notice informs the city a lawsuit is to be filed.
>
> Schneider said no one in city government did anything to harm Ferraro, and he dismissed the planned lawsuit as "completely ridiculous."
>
> Ferraro and Schneider have sparred publicly and privately since Schneider was a city councilman in 1989 over the maintenance of Hoey Avenue Park, Ferraro's work schedule, overtime pay and other issues.
>
> Ferraro, who served as public works director during former Mayor Philip D. Huhn's eight-year tenure, resigned the post shortly before Schneider won the mayoral election last May, and returned to his previous civil service post as superintendent of parks and public property.
>
> Ferraro said the Schneider administration had engaged in a series of actions "to put me down in front of the men and let them know I'm no longer in charge, to put me in my place."
>
> His superintendent's job involved supervision, and should not have included strenuous manual labor, Ferraro said.
>
> Last Dec. 28, Ferraro was ordered to shovel snow from City Hall steps the morning after a storm dumped as much as 7 inches on parts of Monmouth County. While cleaning the steps, Ferraro was stricken with a massive heart attack.
>
> He tumbled down a flight of brick steps; his heart stopped and he ceased breathing for several minutes. He was revived by the city's former fire chief, a police patrolman and two paramedics, all of whom happened to be nearby.

That morning, Ferraro said, he reported to work a half-hour early and was told to drive a snowplow. Ferraro recalled stating that because he had a sinus headache, had taken some medication and had not driven such a large truck in several years, he shouldn't operate the plow. A foreman then told him to shovel snow at City Hall, Ferraro said.

He attributed the heart attack to a combination of physical exertion and anger he felt over being ordered to perform the task.

"I went down there, and it bothered me," he said. "As I was shoveling the snow, the exertion of it combined with being mad, I got a sharp pain in my chest. I grabbed for the railing and went tumbling down the steps." Ferraro said he does not remember anything after that.

Former Fire Chief Arthur Van Pelt, a member of the Long Branch First Aid Squad, and Police Patrolman Peter Schaus responded to a report that someone had fallen on the steps. As two MONOC paramedics arrived about two minutes later, Ferraro's heart stopped, and he stopped breathing. Van Pelt, Schaus and the paramedics brought Ferraro inside City Hall where they struggled to revive him.

Van Pelt and Schaus performed cardio-pulmonary resuscitation on Ferraro, while the paramedics inserted an artificial airway into his throat. Shortly afterward, Ferraro's heart and lungs began working again.

Schneider said Ferraro's claims are without merit.

"Nobody ever did anything to harm Mr. Ferraro, and I'm sure that's exactly what will come out as this matter progresses," the mayor said. "It's unfortunate that he's chosen this method of attack. If the notion is to embarrass us, I think it's unfortunate."

On or about August 24, 1993, Schneider provided Forest with a copy of a medical report, dated July 3, 1992, which had been prepared for the City in anticipation of plaintiff's workers' compensation case.[3] In this new report, the same doctor who prepared the first evaluation rejected the notion that plaintiff's collapse resulted from a cardiac ailment. He now reported that plaintiff had a "normal electrocardiogram" and expressed the opinion that all of plaintiff's problems stemmed from a "psychotic depression" which had left plaintiff in a "desperate" and "almost vegetative" state. The report concluded that plaintiff "has no coronary artery disease but ... a psychotic depression" and was "in desperate need of admission for psychiatric purposes" to

---

[3] Forest certified that he had "contacted Mayor Adam Schneider and advised him as to John Ferraro's claim of a heart attack caused by his employment ... [and] pressed Mayor Schneider to substantiate the City's position which was contrary to John Ferraro's position."

"brain wash him out of his cardiac neurosis." Upon receipt of this report, Forest "chose not to write a story about the medical report" or the City's position.

In a letter addressed to the "Concerned Resident[s]" of Long Branch which was released during Schneider's 1994 re-election campaign, the Mayor wrote:

> I have tried very hard to run a clean, honest and frugal government, which puts the interests of the city above politics and personalities. That is why I feel badly that on one occasion I got carried away in my defense of what I thought was the public interest.
>
> John Ferrara's [sic] $5 million lawsuit faces us with a major increase in insurance costs when we are trying vigorously to hold the line on taxes. Although the first ruling by the court favored the city's contention of a frivolous lawsuit, I made the mistake of taking matters into my own hands by inappropriately releasing to the press information which supported our case.
>
> I was angry at a reporter who insisted Mr. Ferrara's [sic] medical condition was a fact when that condition had not been proven in court. Initially I was too ashamed of my mistake to admit I had sent the information. But I quickly realized the best thing to do was to take my lumps for acting thoughtlessly. And so within a few days of my mistake I admitted it publicly.
>
> Still I did not believe my opponents on the City Council would be so merciless and unscrupulous in their attacks on me. They have tried to make this one indiscretion into some kind of Watergate affair.
>
> Did I make a mistake by incorrectly releasing information to the press and waiting a few days before owning up?
>
> Yes.
>
> Did I make a mistake trying to defend the city against what I believe is a frivolous, but potentially damaging lawsuit?
>
> No. ...

In his workers' compensation case, plaintiff produced proofs that he suffered an "acute cardiac arrest secondary to severe coronary artery spasm with impaired cognition for which he has a permanent cardiac disability of 100% of total." Dr. Rowland D. Goodman II's June 21, 1994 evaluation also reported that "the onset of this condition was initiated and triggered as a result of ... [plaintiff's] emotional stress and ... physical exertion ... [w]hen this patient engaged in shoveling snow...." The December 14, 1994 report of the City's psychiatrist concluded that plaintiff suffered "major depression post trauma" rendering him "totally and permanently disabled on a psychiatric basis ... which

... is in fact related to his employment." The doctor stated his belief that the work related "stress combined with the excess work in a cold environment probably did cause the cardiac incident." That report concluded that plaintiff's "reaction of depression since that time probably relates to both the cardiac incident and the psychiatric stress that he was under during ... his last days at work" and that "it [was] impossible to tease out one from the other in regard to his present psychiatric disability." Plaintiff's workers' compensation action was eventually settled on May 8, 1997.

## II.

Plaintiff argues that count four of his second amended complaint, which asserted both a First Amendment § 1983 claim and related state law claims, was improperly dismissed.[4] He asserts that the trial judge improperly concluded both that his First Amendment claim was precluded by the Third Circuit opinion and that, if it was not, the new "theory of liability" was barred by the statute of limitations.

In her May 15, 1996 letter opinion, the Law Division judge decided to dismiss "all federal claims, including those under the First Amendment of the United States Constitution and Section

---

[4] Count four of plaintiffs' second amended complaint, bearing no subtitle or caption, alleged that defendants' conduct violated the First Amendment and, therefore, the federal Civil Rights Act:

4. The actions of the defendants as set forth hereinabove were motivated by and based upon the plaintiff *John Ferraro's permissible political expressions, activities or affiliations* in violation of 42 U.S.C., section 1983 and N.J.A.C. 4A:2–5.1(b) and other portions of the New Jersey Administrative Code and the laws, statutes and *Constitutions of the State of New Jersey and the United States.*

5. The defendants intentionally, willfully and knowingly *violated the prohibition established by the First Amendment to the United States Constitution* and by N.J.A.C. 4A:2–5.1(b) with the intent to harass plaintiff in order to deprive him of his position, status, reputation and standing among the employees of the City of Long Branch and in the community, and otherwise to inflict great physical, emotional and financial harm upon the plaintiff. [ (Emphasis added).]

1983, because of the precedential effect of the Third Circuit opinion decided May 10, 1994." However, plaintiff notes that "[n]o federal statutory or constitutional claim was addressed in the federal courts other than the Fifth and Fourteenth Amendment *property* and *due process claims of the original First Count.*" In fact, the Third Circuit noted that no First Amendment claim was raised.[5] *See Ferraro v. City of Long Branch, supra,* 23 *F.*3d at 806, n. 2.

Plaintiffs are technically correct that the first count of the original complaint did not refer to political retaliation, the fourth count did not then refer to the First Amendment, and the Third Circuit's decision focused only on the question of whether plaintiff had adequately stated a claim of deprivation of a constitutionally protected property right. *Id.* at 805. Affirming the District Court, the Third Circuit repeatedly noted that plaintiff had failed to state a claim inasmuch as he was not directly or constructively discharged from his position and, accordingly, he was not deprived of a protected property interest under the Fourteenth Amendment's due process clause. *Id.* at 805–07.

---

[5] While the initial complaint's first count—subtitled "Civil Rights Claim—42 U.S.C., Section 1983"—made no allegation of a First Amendment violation, the fourth count of that complaint, designated by plaintiff as stating a claim for "[v]iolation of N.J.A.C. 4A:2–5.1," did allege that defendants' conduct against him was motivated by plaintiff's political activities and affiliations in violation of, *inter alia,* the United States Constitution. There was no specific reference therein to the First Amendment.

In bringing a First Amendment § 1983 action such as the one presently asserted, an employee must initially demonstrate "that his conduct was protected by the First Amendment," that he or she suffered an adverse employment action, and that the protected conduct "was a 'substantial' or 'motivating' factor in the employer's [adverse] action." *Click v. Copeland,* 970 *F.*2d 106, 113 (5th Cir.1992) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 *U.S.* 274, 287, 97 *S.Ct.* 568, 576, 50 *L.Ed.*2d 471, 484 (1977)). "[E]xcept where political affiliation may reasonably be considered an appropriate job qualification," a public employee is constitutionally protected from reprisal "for supporting or affiliating with a particular political party." *Board of County Comm'rs v. Umbehr,* 518 *U.S.* 668, 675, 116 *S.Ct.* 2342, 2347, 135 *L.Ed.*2d 843, 851 (1996).

■ Thus, the Third Circuit did not rule on a First Amendment claim and only addressed the federal claim embodied in the first count of the complaint which had been dismissed by the District Court. However, the first count of plaintiffs' complaint which was the basis of the removal to the federal court was captioned "Civil Rights Claim—42 U.S.C., Section 1983" and alleged, among other things:

5. The defendants, Schneider, Critelli, Council members and other officials, agents, servants and employees acted intentionally, wilfully and knowingly under the color of the statutes, ordinances, rules and customs of the City of Long Branch and the State of New Jersey to deprive the plaintiff John A. Ferraro of his rights, privileges and immunities secured by the laws and regulations governing municipal employment in the classified service in the State of New Jersey and more specifically deprived him of the rights and privileges of a person holding the title of Superintendent of Parks and Public Property and subjected the plaintiff to the deprivation of a legally protected property right in his employment secured by the Constitution and laws of the United States and the State of New Jersey without due process of law in violation of those Constitutions and the statutes in such case made and provided.

6. As a result of the intentional, willful and knowing denial of rights and privileges of the plaintiff, the defendants have shown a reckless and callous disregard of a legally protected property right under the Constitution and laws of the United States and the State of New [J]ersey and are liable to the plaintiff for compensatory and punitive damages pursuant to 42 U.S.C., section 1983 and attorneys fees pursuant to 42 U.S.C., section 1988.

Under these circumstances, we hold that plaintiff's section 1983 claim was disposed of in the federal courts and cannot be relitigated in the State courts of New Jersey. The facts on which plaintiff based his federal claim—the political retaliation—were all known both before the original complaint was filed and before the action was removed to and considered in federal court.[6] *Cf.*

---

[6] The factual basis for the First Amendment claim stems from the alleged political retaliation when Schneider became Mayor of Long Branch in 1990, not when he released the medical report the same month the District Court dismissed plaintiff's federal claim in August 1993.

The original count four, captioned "[v]iolation of N.J.A.C. 4A:2–5.1," stated in part:

3. The actions of the defendants as set forth hereinabove *were motivated by and based upon the plaintiff John Ferraro's permissible political activities or affiliations in violation* of N.J.A.C. 4A:2–5.2(b) and other portions of the

*Watkins v. Resorts Int'l Hotel & Casino, Inc.,* 124 *N.J.* 398, 410–12, 591 *A.*2d 592 (1991) (state civil rights claim not barred by dismissal of federal claims in federal court based on insufficient service of process and lack of standing); *Velasquez v. Franz,* 123 *N.J.* 498, 505–07, 589 *A.*2d 143 (1991) (no preclusion of state court action because federal disposition was not on the merits). *See also Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 *N.J.* 336, 346–48, 662 *A.*2d 536 (1995). The section 1983 claim was before the federal court and adjudicated there on the merits. A dismissal for failure to state a claim, as the Third Circuit upheld here, is a disposition on the merits. *Velasquez v. Franz, supra,* 123 *N.J.* at 507–08, 589 *A.*2d 143. Plaintiff could not bifurcate his federal claims or the theories on which he advanced his § 1983 claim. Only the state claims were remanded to the state court; no federal claims were reserved. *Cf. Manhattan Woods Golf Club, Inc. v. Arai,* 312 *N.J.Super.* 573, 711 *A.*2d 1367 (App.Div. 1998) (New Jersey state court can consider claim expressly reserved in federal bankruptcy action). *See also Velasquez, supra,* 123 *N.J.* at 508–09, 589 *A.*2d 143. Thus, the federal claims were properly dismissed by the Law Division.

## III.

Plaintiff argues that the Law Division nevertheless improperly dismissed the first count of his second amended complaint.[7] Ac-

---

New Jersey Administrative Code and the laws, statutes and *Constitutions of the State of New Jersey and the United States.*

[ (Emphasis added).]

If the federal courts omitted consideration of plaintiff's fourth count in dismissing the federal action (even though only the first count was captioned as a § 1983 action), plaintiff should have petitioned for reconsideration there. He does not even consider the ability of the federal courts to address the present claim as that may affect preclusion in either the federal or state forum. We do not suggest that the Law Division could not have considered the First Amendment claim if plaintiff urged and demonstrated that *federal* law did not preclude that.

[7] We also treat the fourth count as alleging violations of fundamental state policy and constitutional law. However, as plaintiff does not assert a claim

cording to plaintiff, under New Jersey law he possessed a property right in the duties and authority ordinarily associated with the position of Superintendent of Parks and Public Property, and consequently, defendants' actions in depriving him of his rightful authority constituted a violation of his State due process rights. His argument is that "the plaintiff has a vested right in the duties, status, authority and other rights inherent to his classified civil service title which right is entitled to protection under the laws of the State of New Jersey." While plaintiff emphasizes his rights under civil service legislation and implementing regulations, he appears also to be asserting a constitutional claim under *N.J. Const.* Art. I, ¶ 1 which assures "[a]ll persons . . . certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, [and] of acquiring, possessing and protecting property. . . ." *See also Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 159–63, 390 *A.*2d 90 (1978) (due process right to hearing before public employee can be terminated with finality).

In dismissing the first count, the Law Division concluded:

The first count of the second amended complaint alleges that defendants violated plaintiff's due process rights, fundamental fairness and related principles and doctrines of state law. Plaintiff has failed to demonstrate any deprivation of a property or liberty interest as required to pursue a due process claim. No case cited by plaintiff or discovered by the court supports such finding. In the absence of such an interest, plaintiff cannot prevail on Count One. Therefore, I will dismiss the first count of plaintiff's second amended complaint.

We agree.

■ In *Scancarella v. Department of Civil Serv.,* 24 *N.J.Super.* 65, 70, 93 *A.*2d 637 (App.Div.1952), we observed that "[t]he design of civil service legislation was to secure tenure during good behavior for those employees who come within its scope . . . and to give protection against *dismissal and other types of discrimination* to those holding positions which the Legislature placed in the

---

under *N.J. Const.* art. I, ¶ 6, nor argues it is equivalent to the First Amendment in this respect, we do not consider such a claim under the State Constitution and do not further address that aspect of count four.

classified service." (Emphasis added). The "other types of dis-crimination" recognized by the *Scancarella* court included "reduc-tion in rank, status or compensation." *Id.* at 69, 93 *A*.2d 637. Here, plaintiff was neither discharged nor suffered a reduction in pay, and his rank and status within the civil service hierarchy were unaffected by defendants' actions. Thus, he suffered no deprivation of a property interest. *See Ferraro v. City of Long Branch, supra*, 23 *F*.3d at 806.

Nevertheless, plaintiff contends that depriving an employee of the "customary duties and authority of his government position" may be considered the equivalent of an improper dismissal effectu-ated without "formal action consistent with the applicable statute and regulations" which thereby gives rise to an actionable proper-ty right. He relies on *Edelstein v. City of Asbury Park*, 12 *N.J.Super.* 509, 511, 79 *A*.2d 860 (App.Div.1951), in which plaintiff, a taxpayer in the City of Asbury Park, appealed from the dismiss-al of his action which sought to have a recently enacted local ordinance set aside. The ordinance, which created the office of Superintendent of Police and vested the holder of that office with complete authority over the Chief of Police and police department, had been passed upon the recommendation of the City Manager, following a determination that the Chief of Police was incompe-tent. *Id.* at 511–13, 79 *A*.2d 860. Although the city was aware that the current Chief could not be discharged or demoted without the filing of formal charges and a hearing, no charges were ever filed. *Id.* at 512, 79 *A*.2d 860.

We concluded that the ordinance was "intended to and did in substance, although perhaps not in form," displace the current Chief as the functioning Chief of the Asbury Park Police Depart-ment, *id.* at 513, 79 *A*.2d 860, and that the trial court improperly dismissed the case because there was a possibility that the city's actions "constitute[d] improper action warranting judicial inter-vention." *Id.* at 513–14, 79 *A*.2d 860. We further noted that "the fact that the chief retained his salary and his nominal title while being stripped of his authority as chief was not of sufficient

significance" to automatically absolve the city of any wrongdoing. *Id.* at 514, 79 *A.*2d 860. Accordingly, we remanded for further proceedings, including presentation of a defense, if the matter was not moot. But we did not suggest that the Chief of Police had any right to money damages. In fact, we noted that the Chief had already "voluntarily resigned." *Ibid.*

In *Pillsbury v. Board of Chosen Freeholders of Monmouth County*, 133 *N.J.Super.* 526, 529, 337 *A.*2d 632 (Law Div.1975), *aff'd o.b.*, 140 *N.J.Super.* 410, 356 *A.*2d 424 (App.Div.1976), John M. Pillsbury, County Counsel of Monmouth County, and the Board of Chosen Freeholders filed suit against each other over the Board's right "to terminate" the attorney before the end of his statutory term. 133 *N.J.Super.* at 528, 337 *A.*2d 632. The dispute arose after Pillsbury, whose statutory term had begun during a prior administration, was informed by the Board that a newly appointed "special counsel" would be assuming his responsibilities. *Id.* at 529–30, 337 *A.*2d 632. After Pillsbury refused to turn over all his files to the new counsel and to submit his resignation, the Board instructed him to release the records to the Board's director for reassignment and to cease attending public meetings. *Id.* at 530, 337 *A.*2d 632. Pillsbury again refused and the suit was begun.

We affirmed the trial judge's holding that the Board did not possess the power to remove Pillsbury prior to the expiration of his statutory term without cause. *Pillsbury, supra,* 140 *N.J.Super.* at 412–14, 356 *A.*2d 424. We rejected the Board's position that it, as Pillsbury's client, had the right to discharge Pillsbury at any time pursuant to the rules adopted by the Supreme Court regarding the attorney-client relationship. *Ibid.; see Pillsbury, supra,* 133 *N.J.Super.* at 533–36, 337 *A.*2d 632.[8] In affirming the trial judge's opinion, we further noted that while the Board might

---

[8] *But see Cohen v. Radio–Elecs. Officers Union, Dist. 3,* 146 *N.J.* 140, 679 *A.*2d 1188 (1996) (dealing with a private retainer agreement and not a statutory position).

appoint special counsel for specific legal matters, it could not use this authority "as a guise to obscure the real intention to strip the duly and regularly appointed counsel of his powers and responsibilities as counsel." *Pillsbury, supra,* 133 *N.J.Super.* at 537, 337 *A.*2d 632.

*Edelstein* merely passed upon the validity of an ordinance, 12 *N.J.Super.* at 514, 79 *A.*2d 860, and *Pillsbury* held that the Board of Freeholders could not deprive an individual of his statutory position before the expiration of his term, 133 *N.J.Super.* at 537–38, 337 *A.*2d 632. This case is quite different as there was no endeavor to discharge plaintiff or terminate his classified position.

Pillsbury would have lost his job, title and compensation, 133 *N.J.Super., supra,* at 530, 337 *A.*2d 632, but here, plaintiff did not. Rather, he essentially contends that because he occupied a supervisory position, he should not have been ordered to perform the work of non-supervisory personnel within his downsized department. But courts should not be in the business of micromanaging work crews, personnel decisions and job assignments, *see Ferraro v. City of Long Branch, supra,* 23 *F.*3d at 806–07, and we do not read *N.J. Const.* Art. I, ¶ 1, to give greater protection than the Fifth and Fourteenth Amendments in this respect. Thus, as plaintiff "concedes [that defendants] did not change his job title or modify his salary and benefits," *Ferraro, supra,* 23 *F.*3d at 806, he cannot collect damages under New Jersey law. Moreover, we do not read the New Jersey statutes and rules which protect civil servants and classified public employees to suggest that their breach may give rise to a suit for money damages as opposed to administrative relief. *Cf. Parks v. Pep Boys,* 282 *N.J.Super.* 1, 14–15, 659 *A.*2d 471 (App.Div.1995) (recognizing that "[u]nder certain circumstances a violation of a statute can generate a civil remedy even where no such remedy is included in the act"); *Bortz v. Rammel,* 151 *N.J.Super.* 312, 320–21, 376 *A.*2d 1261 (App.Div.), *certif. denied,* 75 *N.J.* 539, 384 *A.*2d

518 (1977).[9]  *See also infra,* Point V.A., concerning private causes of action.

## IV.

We believe that count three of his original complaint, which alleged a violation of *N.J.A.C.* 4A:3–3.4, and count four of his original complaint, which alleged a violation of *N.J.A.C.* 4A:2–5.1(b), were properly dismissed for failure to exhaust administrative remedies.

Independent of the fact that the breach of administrative regulations does not of itself give rise to a private cause of action, plaintiff did not pursue his claims before the Department of Personnel, even though he asserts he was entitled to protection as a classified civil service employee from the conduct of his municipal employer. There was no need for extraordinary direct judicial action. *See New Jersey Civil Serv. Ass'n v. State,* 88 *N.J.* 605, 613, 443 *A.*2d 1070 (1982); *Triano v. Division of State Lottery,* 306 *N.J.Super.* 114, 122, 703 *A.*2d 333 (App.Div.1997).

## V.

We affirm the dismissal of the separate complaint filed against Schneider in May 1994 substantially for the reasons given by the trial judge. We add the following.

---

[9] We recognize that no "tangible employment action" is required to bring a federal Title VII sexual harassment case against an employer if the conduct is "severe and pervasive." *Burlington Indus., Inc. v. Ellerth,* —— *U.S.* ——, 118 *S.Ct.* 2257, 2264, 141 *L.Ed.*2d 633 (1998); *see also* 42 *U.S.C.A.* §§ 2000e to 2000e–17; *Faragher v. City of Boca Raton,* —— *U.S.* ——, 118 *S.Ct.* 2275, 141 *L.Ed.*2d 662 (1998). Plaintiff's brief does not assert a right under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 to –49, to support a similar claim. The LAD does not include reference to political affiliation, and plaintiff points to no New Jersey statute which expressly prohibits discrimination on that basis. *See also supra,* note 7.

## A.

■ Plaintiff claims that release of medical records and information concerning his medical and psychological conditions violate both Executive Order No. 11 and City of Long Branch Ordinance 2–30.1 to –30.13. However, neither grants a private right of action to an injured citizen. Nor does the Right to Know Law, *N.J.S.A.* 47:1A–1 to –4, under which the Executive Order was issued. *See Shuttleworth v. City of Camden,* 258 *N.J.Super.* 573, 591–92, 610 *A.*2d 903 (App.Div.) (referring to *N.J.S.A.* 47:1A–2 and ability to exclude by Executive Order what otherwise would be a "public record"), *certif. denied,* 133 *N.J.* 429, 627 *A.*2d 1135 (1992).

In determining whether a statute implicitly creates a private cause of action, our Supreme Court has directed that courts should consider: (1) whether plaintiff is a member of the " 'class for whose *especial* benefit the statute was enacted' "; (2) "whether there is any evidence that the Legislature intended to create a private cause of action under the statute"; and (3) whether such an implied private cause of action would be " 'consistent with the underlying purposes of the legislative scheme.' " *Matter of State Comm'n of Investigation,* 108 *N.J.* 35, 41, 527 *A.*2d 851 (1987) (quoting *Cort v. Ash,* 422 *U.S.* 66, 78, 95 *S.Ct.* 2080, 2088, 45 *L.Ed.*2d 26, 36 (1975)); *see also Crusco v. Oakland Care Ctr., Inc.,* 305 *N.J.Super.* 605, 614–15, 702 *A.*2d 1363 (App.Div.1997); *Parks v. Pep Boys,* 282 *N.J.Super.* at 14–15, 659 *A.*2d 471. Such an approach has also been deemed appropriate in the context of municipal ordinances. *See Liptak v. Frank,* 206 *N.J.Super.* 336, 339–40, 502 *A.*2d 1147 (App.Div.1985), *certif. denied,* 103 *N.J.* 471, 511 *A.*2d 652 (1986) (in determining whether a municipal ordinance should be construed as providing a private right of action, courts should consider whether the "remedy is consistent with the legislative provision, appropriate for promoting its policy and needed to assure its effectiveness") (quoting 4 *Restatement (Second) of Torts* § 874A (1977)).

■ The beneficiaries of the Right to Know Act are the members of the public seeking information and not those who seek to

invoke their right to privacy, and we can find nothing in the Act which reflects any legislative intent to create private causes of action for those who believe that their privacy rights have been violated. Such an implied private cause of action could be perceived as inconsistent with the underlying purposes of the legislative scheme. The same can be said with respect to the promotion of the policy behind the Long Branch ordinance.

### B.

■ We agree with plaintiff that exhaustion of administrative remedies is not a prerequisite for an action under Title II of the Americans with Disabilities Act ("ADA"), 42 *U.S.C.A.* § 12101 to § 12213. *See Noland v. Wheatley,* 835 *F.Supp.* 476, 482–83 (N.D.Ind.1993). However, with respect to the alleged violations of Title II of the ADA, 42 *U.S.C.A.* § 12132 provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

■ In order to establish a violation of Title II of the ADA by these defendants, a plaintiff must show: (1) that he or she "has a disability;" (2) "is otherwise qualified for the employment or benefit"; (3) that he or she was "excluded from the employment or benefit … solely on the basis of the disability"; and (4) the provider of the "service[ ], program[ ], or activit[y]" is "a public entity." *Doe v. University of Md. Med. Sys. Corp.,* 50 *F.*3d 1261, 1264 n. 8, 1265 (4th Cir.1995). Here, assuming that plaintiff is disabled for purposes of the ADA, he has failed to either plead, or in any way substantiate, that he was "excluded from participation in or [has] be[en] denied the benefits of the services, programs, or activities of a public entity, or be[en] subjected to discrimination by any such entity" by reason of his disability. 42 *U.S.C.A.* § 12132. While the inability to perform work because of a disability may still be a basis for employer action, *Nieves v. Individualized Shirts,* 961 *F.Supp.* 782, 794–97 (D.N.J.1997), defendants did not terminate plaintiff nor prevent him from working. And there

is no claim that plaintiff—who received workers' compensation benefits because of his work related disability—was either refused benefits or treated in any discriminatory way as a result of the disability, something quite different than the conduct which plaintiff insists caused his physical and medical condition.

## C.

Plaintiff's cause of action against Schneider for defamation based upon his statements regarding the frivolous nature of plaintiff's suit and Schneider's release of the medical report was properly dismissed. Schneider was merely offering his opinion or adopting as his own the opinion of another, and he did so in response to a public official's public allegations as reported in the press.[10] *See Fees v. Trow*, 105 *N.J.* 330, 338–42, 521 *A.*2d 824 (1987); *Burke v. Deiner*, 97 *N.J.* 465, 475, 479 *A.*2d 393 (1984). In order to establish "actual malice," a plaintiff must show that the defamatory statement was made " 'with knowledge that it was false or with reckless disregard of whether it was false or not,' " and animosity between the parties involved is irrelevant. *Burke,* 97 *N.J.* at 475, 479 *A.*2d 393 (quoting *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 725–26, 11 *L.Ed.*2d 686, 706 (1964)).

Moreover, the tort of invasion of privacy by unreasonable publication of private matters occurs when it is shown that "the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized." *Bisbee v. John C. Conover Agency, Inc.,* 186 *N.J.Super.* 335, 340, 452 *A.*2d 689 (App.Div.1982) (citing 3 *Restatement (Second) of Torts* § 652D (1977)). "[Even] if the critical

---

10 Plaintiff does not deny that he first gave a statement to the press or that Schneider's comments were in response to plaintiff's statements to the press. In any event, plaintiff was a public official. *See Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 344, 94 *S.Ct.* 2997, 3009, 41 *L.Ed.*2d 789, 807–08 (1974).

facts are private, publication of those facts would not constitute an actionable invasion of privacy if they are 'newsworthy' and thus a matter of legitimate public concern." *Romaine v. Kallinger,* 109 *N.J.* 282, 300–01, 537 *A.*2d 284 (1988). If a matter is "within the sphere of public interest," facts related to the subject that would otherwise be deemed private may be considered newsworthy, and therefore publishable, and that is a question of law for the court to decide. *Id.* at 301, 537 *A.*2d 284.

The issue of responsibility for plaintiff's collapse and subsequent disability had been rendered newsworthy by virtue of both plaintiff's status as a public official and the possibility of the City of Long Branch being held responsible for damages, as well as the publication of several articles on the subject, including at least one in which plaintiff publicly aired his grievances against the City. Hence, while Schneider's release of the medical report may have been inappropriate (as he himself admitted), it was newsworthy and therefore publishable.

## VI.

We do not believe the remaining issues on plaintiffs' appeal require comment. *R.* 2:11–3(e)(1)(A)(E).

## VII.

We also reject defendants' cross-appeal.[11]

■ While a prevailing plaintiff in a § 1983 action generally obtains counsel fees absent special circumstances, *see Stockton v. Rhulen,* 302 *N.J.Super.* 236, 241, 695 *A.*2d 309 (App.Div.1997), in deciding whether to grant a prevailing defendant's request for attorney's fees pursuant to 42 *U.S.C.* § 1988(b), a court should consider whether " 'the plaintiff's action was frivolous, unreasonable, or without foundation....' " *Commonwealth of Pa. v. Flah-*

---

[11] Defendants do not press their contention before the Law Division under the New Jersey frivolous litigation statute, *N.J.S.A.* 2A:15–59.1(2).

*erty,* 40 *F.*3d 57, 60 (3d Cir.1994) (quoting *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 *U.S.* 412, 421, 98 *S.Ct.* 694, 700, 54 *L.Ed.*2d 648, 657 (1978)), and the United States Supreme Court has cautioned that:

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims ... Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.
>
> [*Christiansburg Garment Co. v. EEOC, supra,* 434 *U.S.* at 421–22, 98 *S.Ct.* at 700–01, 54 *L.Ed.*2d at 657.]

Accordingly, it has been recognized that "[t]he award of attorneys' fees to a prevailing defendant is 'not routine' and should only 'be sparingly awarded,'" *Hurley v. Atlantic City Police Dept.,* 933 *F.Supp.* 396, 427 (D.N.J.1996) (quoting *Quiroga v. Hasbro, Inc.,* 934 *F.*2d 497, 503 (3d Cir.), *cert. denied,* 502 *U.S.* 940, 112 *S.Ct.* 376, 116 *L.Ed.*2d 327 (1991)), and the Law Division's decision on the issue shall be upheld unless we can say it constituted an abuse of the trial court's considerable discretion. *See United States v. State of Miss.,* 921 *F.*2d 604, 608–09 (5th Cir.1991).

Defendants argue that the Law Division erred in determining that defendants were precluded from seeking counsel fees in connection with the federal court action in light of the residual federal law claims which were not resolved until the Law Division dismissed them, giving rise to this appeal. Defendants also contend that because the remainder of plaintiff's claims were either utterly baseless factually or not legally cognizable, as indicated by their eventual dismissal, a fee award was clearly warranted. According to defendants, once it became apparent that plaintiff had no facts to support his allegations and that his proposed amendments to his complaint merely consisted of efforts to reintroduce federal claims which had already been dismissed, plaintiff was under an obligation to discontinue his lawsuit.

We agree with the trial court that counsel fees in connection with the federal action should have been filed in the

federal court. The federal action cannot be considered merely a component of the present state court action. We also conclude that the trial judge, in any event, did not abuse her discretion in denying counsel fees. Although we uphold the dismissal of plaintiffs' complaint, the First Amendment claim if timely pursued was at least colorable, and the State claim was clearly not frivolous or pursued in bad faith.

## VIII.

The judgment is in all respects affirmed.